## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 23 2016, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of N.D. and A.J., Minor Children | September 23, 2016 |
| | Court of Appeals Case No. 49A02-1603-JT-415 |
| L.J., Mother, | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | The Honorable Marilyn A. Moores, Judge |
| v. | The Honorable Larry E. Bradley, Magistrate |
| The Indiana Department of Child Services, | Trial Court Cause Nos. 49D09-1506-JT-425 49D09-1506-JT-426 |
| *Appellee-Petitioner.* | |

**Brown, Judge.**

[1] L.J. ("Mother") appeals the involuntary termination of her parental rights with respect to her daughters, A.J. and N.D. Mother raises two issues which we consolidate and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

### Facts and Procedural History

[2] On January 6, 2002, A.J. was born to Mother and B.D. ("Father").[1] On December 26, 2002, N.D. was born to Mother and Father.

[3] In April 2013, Mother was living with J.M., the father of three of her other children, and eight of her children in a residence on Goodlet Street. Mother was arrested for disorderly conduct and served nine days in jail. That month, DCS filed a petition alleging that A.J., N.D., and five of Mother's other children were children in need of services ("CHINS") because Mother failed to provide a safe living environment with necessary supervision, she was recently arrested and incarcerated leaving the children without an appropriate caregiver, there were allegations that one of Mother's children was "perpetrating sexually on his siblings," and A.J. recently obtained a grease burn due to lack of supervision. Petitioner's Exhibit 1.

[4] In June 2013, the parties agreed to an informal adjustment under which Mother would participate in home based therapy and case management, substance

---

[1] DCS stated that Father was the alleged father of A.J., and Mother testified that Father was the father of A.J. Father signed consents for the adoption of A.J. and N.D.

abuse treatment, domestic violence education, and submit to random urine drug screens. Other than the domestic violence education, Mother was actively involved in services until January 2014, but completed only her substance abuse treatment as a part of the informal adjustment. On December 11, 2013, DCS requested an extension of the informal adjustment because of Mother's housing instability.

[5] On January 3, 2014, Mother called Family Case Manager Annaliese Gibbs[2] ("FCM Gibbs") regarding a domestic violence incident that had occurred in the home on Belleview. FCM Gibbs determined that J.M. and his girlfriend were also residing in the home and "that turned out to be a . . . bit of a dysfunctional situation for the family." Transcript at 71. That same day, Mother discussed with FCM Gibbs and the home based therapist that she had continued to struggle with alcohol even after successfully completing her treatment in September 2013 and that she also "had incidence [sic] of domestic violence between herself and [J.M.], who was residing in the home." *Id.* at 71-72. Mother was open about the abuse she was suffering and admitted that her home was not a safe place. On January 3, 2014, the children were removed from the home, and Mother also moved out.

---

[2] FCM Gibbs indicated that she was formerly known as Annaliese Diaz.

[6]     On January 9, 2014, DCS filed a verified petition alleging that A.J. and N.D. were CHINS.[3] DCS alleged that the children's physical or mental condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the children's parents to supply them with necessary food, clothing, shelter, medical care, education, or supervision. DCS alleged that FCM Gibbs determined that Mother failed to provide the children a safe and secure home free from domestic violence and that she and J.M. had a history of violence and engaged in domestic violence in front of the children. DCS alleged that Mother and J.M. had unsuitable housing in which the utilities were turned off and there was inadequate bedding. DCS also alleged that the whereabouts of Father were unknown and he had failed to meet his children's needs and protect them from domestic violence in the home.

[7]     That same day, the court held a hearing at which Mother appeared, and the court authorized the children's continued removal. Mother signed a document titled "Respondent's Admission to Amended Petition, Paragraph 4(a)," stating that the children are CHINS because Mother requires assistance providing the basic necessities for the children such as housing with functioning utilities, and it also states: "services: Home Based, Domestic Violence Intake, ensure [N.D.] remain[s] in therapy, Substance Abuse Assessment." Petitioner's Exhibit 16.

---

[3] The petition also listed Mother's other children, but this appeal involves the termination of Mother's parental rights as to only A.J. and N.D.

[8]  On February 12, 2014, the court found the children to be CHINS, held a dispositional hearing, and entered a dispositional order and a parental participation order.[4]  The court ordered Mother to engage in a home based counseling program, complete a substance abuse assessment and successfully complete all treatment recommendations, submit to random drug/alcohol screens, complete a domestic violence intake or assessment and complete all services and recommendations, and ensure that N.D. continue to participate in therapy and follow all recommendations.

[9]  In early February, the service providers and DCS had concerns with Mother's struggle in maintaining open communication and in fully participating in services.  DCS attempted to hold a child and family team meeting on February 19th to discuss what barriers Mother may have had towards progressing in her treatment, but Mother did not attend the meeting, and DCS subsequently filed an affidavit to suspend visitation in February 2014.  In March 2014, the court suspended Mother's visitation.

[10]  In March 2014, Mother stated to FCM Gibbs that she had been in Gary, Indiana, for a couple of weeks but had returned to Indianapolis and hoped to re-engage in services and find stable housing and employment.  During a period of time, neither DCS nor the service providers were able to contact Mother.

---

[4] The record does not contain the transcript of the February 12, 2014 hearing.

[11] After a couple of months, DCS determined that Mother was back in Gary, and Mother indicated that she wanted to stay in Gary and requested to transfer her services. In May 2014, FCM Gibbs re-referred services to Mother in Gary for home based therapy and case management, a substance abuse assessment and recommended treatment, domestic violence education, and random drug screens.

[12] In August 2014, FCM Gibbs transferred the case to Family Case Manager Elizabeth Plew ("FCM Plew") who had difficulty reaching Mother at the number she was provided. FCM Plew gave Mother her phone number, and Mother sent text messages to FCM Plew "usually just prior to Court . . . or just after Court asking [her] what happened at Court if she didn't attend." Transcript at 110. There was a period of several months where FCM Plew was unable to reach Mother.

[13] In January 2015, Mother told FCM Plew that she would be moving back to Indianapolis and asked to start visiting A.J. and N.D. Mother did not have an address she could give FCM Plew or a stable plan for housing or employment. To FCM Plew's knowledge, Mother did not move back to Indianapolis.

[14] On January 7, 2015, the court entered an order following a periodic review hearing finding that Mother moved to Gary and was participating in some services, including drug screens which had been negative, but was not participating in substance abuse treatment. The court noted that Mother reported she would be moving back to Indianapolis in February.

[15] On June 5, 2015, DCS filed a verified petition for the involuntary termination of the parent-child relationship between Mother and A.J. and N.D. On January 28, 2016, the court held an evidentiary hearing at which Mother appeared telephonically. She testified that she had nine children and that none of them lived with her at that time, and that J.M. was physically abusing her in front of the children in the Bellview residence. Mother testified that back in January 2014, she took her children to the foster home to "get them to safety" and away from J.M. *Id.* at 43. She stated that she moved to Gary because she did not feel safe anymore.

[16] Mother testified that the water had been shut off to her residence on Belleview but that she had it turned back on and that the utilities including the lights and gas worked. She stated that she did not have electricity for two hours, that [J.M.] paid the bill and the electricity was back on in twenty minutes, and that she moved into her own place on July 1, 2015.

[17] When asked if she just stopped participating in services, Mother answered: "The services, the services, they've been stopped participating with me. They were only going to spend thirty minutes with me and I probably felt like I probably need a hour, hour and a half so." *Id.* at 20. She testified that she did not contact FCM Gibbs when she did not think she was getting services that she needed, and that she received a phone number but no one answered when she called or responded to her text messages. She also stated that she tried to call FCM Gibbs's supervisor but no one answered and that she stopped trying to contact DCS around February 2015.

[18] Mother testified that she works at a soul food restaurant Sundays through Fridays from 6:00 a.m. to 5:00 p.m. and that she is paid every day "under the table." *Id.* at 36. She stated that she would like her children to come home because she is stable and working, had not been arrested, and there had been no domestic violence in the home.

[19] Mother testified that she had not seen A.J. or N.D. for over two years, that she had not been involved in services for about eleven months, and that she did not talk to FCM Plew about initiating visits again with A.J. and N.D. because FCM Plew never wanted to answer or respond to her messages or calls. When asked why she did not complete any services in Gary, Mother answered:

> They just, they stopped coming and stopped calling me and they wasn't doing what they were supposed to do. I think they just in it for the money I'm sorry to say but they was just in it for the money and come and see me and want to leave thirty minutes want to leave. I mean like, then my case manager didn't want to take me here and there where I needed to go. Talked this through myself and got on my feet and getting my stuff, got on my own feet and found my own job and my own place. Walking on my feet by myself without my case manager.

*Id.* at 34.

[20] According to the testimony of FCM Gibbs, who was assigned the case between June 2013 and August 2014, there were multiple housing transitions throughout the first six months including some periods of homelessness in August due to an eviction from Mother's first home. Of the services Mother agreed to, she completed only her substance abuse treatment, and FCM Gibbs subsequently

referred her twice for a substance abuse assessment and treatment based upon her admission to alcohol use. FCM Gibbs also referred Mother twice to domestic violence treatment after her initial referral, but she did not complete those services while FCM Gibbs had the case.

[21] FCM Plew testified that the last time Mother worked with any service providers was January 2015, that Mother never gave her any documentation that she had stable housing or proof of a stable income, and that DCS had concerns with Mother's pattern of instability in housing and employment, her ability to provide for the children, the history of domestic violence and Mother's failure to complete domestic violence treatment, and Mother's history of substance abuse and failure to successfully complete treatment. She testified that the conditions that resulted in the removal of A.J. and N.D. had not been remedied, that it was her belief that the continuation of the parent-child relationship posed a threat to the well-being of A.J. and N.D., and that termination was in the best interests of A.J. and N.D.

[22] The guardian ad litem for A.J. and N.D., Marquia Washum ("GAL Washum"), testified that she reviewed the contents of the entire Child Advocates case file and reports from service providers, interviewed or contacted the case manager, foster parents, and previous guardian ad litem, and visited with A.J. and N.D. multiple times. She testified that A.J. and N.D. did not voice any desire to be placed in Mother's care and that both reported during several visits that they would like to be adopted by their foster parents. GAL Washum recommended the termination of Mother's parental rights because she

had not fully and successfully engaged in services and the children had been out of her care for a significant amount of time. She testified that she believed that the plan of adoption was in the best interests of the children. When asked why Mother should not be given additional time to complete services, GAL Washum answered that the children had been out of Mother's care for a significant amount of time, there were concerns that the reasons for involvement had not been remedied, and the children had bonded to the foster parents and were excelling in that environment.

[23] On February 2, 2016, the court entered an order terminating Mother's parental rights to A.J. and N.D. Specifically, the order states in part:

> Upon evidence presented, the Court now finds *by clear and convincing evidence*:
>
> 1. [Mother] is the mother of [A.J.] and [N.D.], minor children ages thirteen and twelve, respectively.
>
> 2. [Father] is the father of [N.D.] and the alleged father of [A.J.]. He has signed consents for their adoption.
>
> 3. Child in Need of Services Petitions "ChINS" were filed on [A.J.] and [N.D.] on April 11, 2013, under Cause Numbers 49D091304JC03322 & 3 after [Mother] was incarcerated leaving no one to care for the children. There were also allegations that another of [Mother's] children was perpetrating sexually on siblings.
>
> 4. Although the children were initially detained outside the home, they were placed back with [Mother] and the ChINS

matter was dismissed in June 2013, and replaced with an Informal Adjustment.

5. [Mother's] housing was unstable and the Informal Adjustment was extended.

6. Due to [Mother] struggling with alcohol abuse and domestic violence in the home, the children were removed, due to [Mother's] being honest and open with her family case manager, on January 3, 2014.

7. New Child in Need of Services Petitions were filed on [A.J.] and [N.D.] on January 9, 2014, under Cause Numbers 49D091401JC000034 and 49D091401JC000036.

8. On February 12, 2014, the children were adjudicated to be in need of services after [Mother] admitted to allegations that she needed assistance providing basic necessities for the children such as housing with functioning utilities, an [sic] agreed to do home based services, and a domestic violence intake and a substance abuse assessment.

9. Disposition was held on February 12, 2014, at which time the children remained placed outside the home.

* * * * *

12. After the February 12, 2014 disposition date, [Mother's] whereabouts were unknown and she had stopped services that were referred in January and February, 2014.

13. On May 19, 2014, home based therapy and case management, a substance abuse assessment, random urine

screens and domestic violence education were again referred in Gary, Indiana.

14. [Mother] contacted her family case manager to re-engage in services and she had relocated to Gary, Indiana.

15. Services eventually closed in Gary, Indiana and [Mother] never asked for further referrals.

16. [Mother] had completed substance abuse treatment but struggled with alcohol thereafter, and was in need of further treatment.

17. Parenting time for [Mother] was suspended in March 2014, but was authorized to continue upon positive recommendations by the service providers. [Mother] had been inconsistent in visits, services and contact, and she was inappropriate in conversations with the children.

18. [Mother] appeared at a Periodic Review Hearing in January 2015, represented she was moving back to Indianapolis, and requested visits. The Court authorized visits conditioned on positive recommendation by the children's therapist.

19. [Mother] did not have stable housing in Gary until July 2015. Since that time she has resided in a home with her fiancé who has a month to month lease.

20. [Mother] first obtained employment three months ago at a restaurant and gets paid "under the table".

21. The last visit that took place between [Mother] and daughters was on February 15, 2014.

22. [A.J.] and [N.D.] are in a preadoptive placement. They have resided with their current foster parents for over two years.

* * * * *

26. The children have voiced to their Guardian ad Litem their wish to be adopted.

27. There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by [Mother]. [Mother] has still not addressed the issues of domestic violence and alcohol abuse. She does not have independent housing and has been employed, getting paid illegally, for only the past three months when she has a long pattern of instability. Her lack of contact with her family case managers demonstrate a lack of effort at reunification.

28. Continuation of the parent-child relationship poses a threat to the children's well-being in that it would pose as a barrier to obtaining permanency for them through an adoption and into a home where they are happy and excel. The children have been wards for a significant amount of time and need to move forward. [Mother] has not seen the girls for almost two years.

29. Family Case Manager Elizabeth Plew recommends adoption for the children.

30. Guardian ad Litem Marquia Washum recommends termination of parental rights and adoption as being in the children's best interests based on the children's wishes, [Mother's] level of engagement of services, the significant amount of time that has passed, and the children's placement where they are bonded and are excelling.

31.  Termination of the parent-child relationship is in the best interests of the children.  Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.

32.  There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

Appellant's Appendix at 24-26.

## *Discussion*

[24]  The issue is whether the evidence is sufficient to support the termination of Mother's parental rights.  In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child

being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social

consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

"Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))).

[27]     We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of A.J. and N.D. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[28]     In determining whether the conditions that resulted in the children's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement

outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[29] Mother argues that she was a victim of domestic violence and took the initiative to remove herself and her children from the abuser, and that she went to Gary "to get away from this dangerous individual who is incarcerated for murder." Appellant's Brief at 14-15. She contends that there is no evidence that she needs any sort of program to avoid further domestic violence. As to her struggle with alcohol use, she posits that there is no evidence her use continued after the children's removal. Her position is that there was not clear and convincing evidence that her housing or employment created a danger to her children.[5] DCS argues that the court's unchallenged findings support the judgment and that the decision is not clearly erroneous.

---

[5] Mother also raises a number of arguments relating to Father. Specifically, Mother asserts that Father was not served notice of the CHINS petition until after the adjudication and disposition had been made, that the CHINS adjudication and disposition on February 12, 2014, were as to Mother only, and that the order terminating parental rights does not refer to a dispositional order applicable to Father. Mother does not develop a cogent argument as to why these assertions with respect to Father warrant reversal of the

[30]     With respect to Mother's employment, Mother testified that she worked six days a week for the three months prior to the termination hearing, she did not provide any verification of employment to her case manager, and she was being paid "under the table." Transcript at 36. She also testified that her last prior employment was in 2011.

[31]     As for housing, Mother testified that she lived in a residence on Goodlet Street for six or seven months when DCS first became involved, moved to her sister's house and then to a place on Belleview, then went to live with her brother for a couple of weeks, then with her sister in Gary for six months, and then in Indianapolis with a man for three weeks before moving to Gary in July 2015 in a residence that was leased in her fiancé's name under a month-to-month lease.[6] FCM Gibbs testified that she received the case in June 2013 and that there were multiple housing transitions throughout the first six months that she had the case including some times of homelessness in August due to an eviction from Mother's first home. She also testified that Mother lived with the children in a studio apartment that was being rented by a person with whom she had a

_termination of her parental rights, particularly where Father waived his right to a fact finding as to A.J. and N.D. and signed consents for the adoption of A.J. and N.D. Accordingly, we find these arguments waived._

[6] _Mother's testimony regarding her residences is somewhat conflicting. She testified that after she left her house on Belleview, she went to live with her brother for a couple of weeks before leaving town and moving to Gary on April 11, 2014. Counsel for DCS asked Mother where she was living during the six months between April of 2014 and July of 2015, and Mother answered: "2014, I was living in Indianapolis . . . for roughly about three weeks and then I moved here in 2015." Transcript at 18. During cross-examination by the guardian ad litem's attorney, Mother testified that she moved to Gary in April 2015. During questioning by her attorney, Mother testified that she moved to Gary in April 2014. Her attorney stated: "Okay, so I, I was a little confused. Did you ever move back to Indianapolis from Gary once you moved up there in April of 2014?" Id. at 37. Mother responded: "No." Id. She also indicated that she lived in Gary continuously since April 2014._

relationship between December 4, 2013, and January 3, 2014, until the apartment was condemned. We cannot say that the trial court's findings regarding Mother's housing instability are clearly erroneous.

[32] As to the domestic violence education and substance abuse treatment, the record reveals that Mother agreed to participate in substance abuse treatment and domestic violence education as part of the informal adjustment. When asked if Mother participated in services during the time period from June 2013 until January 2014, FCM Gibbs stated that "*besides from [sic] the domestic violence education*, she was actively . . . involved in the other services up until the January date." Transcript at 91-92 (emphasis added). Mother completed her substance abuse treatment in September 2013 as part of the informal adjustment, but stated in January 2014 that she continued to struggle with alcohol use. While Mother was open about the abuse she was suffering, she did not complete domestic violence education. Her admission that the children were CHINS included a notation for services for domestic violence and substance abuse. In the February 12, 2014 parental participation order, the court ordered Mother to complete a substance abuse assessment and successfully complete all treatment recommendations, and complete a domestic violence intake or assessment and complete all recommended services. FCM Gibbs testified that Mother expressed ongoing concerns with respect to her relationship with J.M. and his harassment of her after she moved to Gary. FCM Plew testified that Mother did complete a substance abuse assessment and that she believed Mother completed a domestic violence assessment, but she did

not complete treatment for either domestic violence or substance abuse. We cannot say that the trial court's finding that Mother has still not addressed the issues of domestic violence and alcohol abuse is clearly erroneous.

[33] We also observe that Mother struggled with maintaining communication and participating in services, did not attend the child and family team meeting on February 19, 2014, stopped participating in services in Gary in February 2015, and did not complete any of the services provided in Gary. In addition to her other testimony, FCM Plew testified that the conditions that resulted in removal of A.J. and N.D. had not been remedied, and that termination was in the best interests of A.J. and N.D. GAL Washum also recommended the termination of Mother's parental rights because Mother had not fully and successfully engaged in services.

## Conclusion

[34] Based upon the court's findings and the record as set forth in part above, we conclude that clear and convincing evidence supports the trial court's determination that there was a reasonable probability that the conditions leading to the removal of A.J. and N.D. would not be remedied.

[35] For the foregoing reasons, we conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence.

[36] Affirmed.

Robb, J., and Mathias, J., concur.